**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**DOROTHY M. HENIGAN,**

                              **Plaintiff,**                    **02-CV-0255A(Sr)**

**v.**

**INDEPENDENT HEALTH ASSOCIATION, INC.,**

                              **Defendant.**

---

## REPORT, RECOMMENDATION AND ORDER

This matter was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and report upon dispositive motions.  Dkt. #4.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1994 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; and the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 *et seq*.  Dkt. #1. Currently before the Court is defendant's motion for summary judgment.  Dkt. #13.  For the reasons set forth below, it is recommended that defendant's motion be granted.

## BACKGROUND

Plaintiff commenced employment with Independent Health as a scanner in a temporary position in the provider relations department in March, 1995.  Dkt. #23, ¶ 8.  In October, 1995, plaintiff was hired permanently as a member/provider services

assistant.  Dkt. #23, ¶ 9.  Approximately one year later, she was promoted to the

position of provider advocate data coordinator.  Dkt. #23, ¶ 9.  During this time, her

direct supervisor was Howard Morgan.  Dkt. #23, ¶ 9.


Beginning in 1997, Mr. Morgan delegated the responsibility of supervising

plaintiff to Diane Frisicaro.  Dkt. #23, ¶ 11.  In a performance evaluation dated April 15,

1999, Ms. Frisicaro included the following comments:

> Filing needs to be completed daily;
> All fields need to be filled in accurately;
> More thorough research needed to improve coding
> accuracy;
> Review notes to ensure accuracy;
> Errors should be minimal;
> Time needs to be organized in order to complete duties;
> Dorothy works numerous overtime hours;
> Questions should be asked to ensure accuracy;
> Dorothy gets along well with department and is a role model;
> Dorothy is very agreeable to change.

Dkt. #23, ¶ 11 & Exh. 4.   In a letter attached to her evaluation, plaintiff directed the

following response to Mr. Morgan:

> We started a new process Jan. 1, 1999 with no
> training, so there was going to be mistakes made during the
> learning curve.  I take my job very seriously and work
> overtime if necessary to make sure it is done.
>      The following things I do not agree with and I refuse
> to sign this evaluation at this time because the demands are
> too high and when this happens then you are dealing with
> stress.  I have never in my life worked under such
> circumstances and a person should not be made to feel like
> this.
>      1. Filing (always done, except for last week
> because we had so much work to do, but now
> it is caught up.)
>      3. [sic] Complaint and Appeal preparation (I try
> my best to code these the best I know how, but
> things are always changing and now we are up

> to 32 codes. Every now and then I may have a
> difficult one but I usually ask some one and get
> the job done.
> 4.  Completes work with minimal mistakes.  (As
> for the logging there were some mistakes
> because it was totally new.  It wasn't
> something that couldn't be fixed, everything
> was corrected for example, in the case of the
> hospital entry I was never told not to type the
> whole name and the ID numbers or not to use
> the suffix.  This is a long process looking up
> this information, logging and scanning and it
> seems that no one realizes this until they do it
> themselves.

Dkt. #23, Exh. 6.

In a performance evaluation dated April 17, 2000, Ms. Frisicaro gave

plaintiff an overall performance rating of Meets Expectations, commenting as follows:

> Dorothy picks up the mail and distributes it daily;
> Filing needs to be completed daily;
> Logging accuracy has improved;
> Scanning needs to be completed daily;
> Dorothy prepares complaints and appeal [sic] accurately;
> Dorothy is very courteous to internal and external
> customers.  She is always willing to help her coworkers;
> Copying is done in a timely manner;
> Dorothy is encouraged to review notes to ensure coding
> accuracy;
> Coding errors have been reduced.  Letters are mailed with
> correct enclosures;
> Time needs to be organized in order to complete duties in a
> timely manner;
> Dorothy takes accurate telephone messages;
> Dorothy is a role model for the department.  She gets along
> well with her co-workers and is always willing to help;
> Dorothy is very agreeable to change.  She has a very
> positive attitude.

Dkt. #23, Exh. 7.  Plaintiff noted the following comments in response to her evaluation:

1. Filing is usually done daily except for those instances
when the volume of work from my other duties is heavy and
needs to be done.
3. Scanning is done after the mail is date stamped and
logged.  There are instances where it may get behind
because of vacations and other time off.  There are also
times when the work load is more than one person could
handle.
4. Organizes time well.  I think I do very well do [sic] to the
volume of work.

Dkt. #23, Exh. 7.

A Memorandum from Howard Morgan to plaintiff, dated the same day,

April 17, 2000, was not delivered to plaintiff, but states, *inter alia*, that

Due to your inability to manage the volume of work in the
provider advocacy department, we are asking that you trade
jobs with Penny Slazak and assume responsibility for the
Hudson Valley Data Coordinators position effective 4/24/00.

This change should ensure that you meet all of your
performance goals and objectives.  You will have daily
goals, which you will need to meet, and for which you will be
reviewed on daily, weekly, and every 30 days. [sic] Your first
weekly review will occur on May 5th, 2000.

Dkt. #23, ¶ 16 & Exh. 8.  This Memorandum was not delivered to plaintiff because Judy

Boyle, Vice President of Human Resources, informed Mr. Morgan that,

You can't demote someone who has a 'Meets Expectations'
on their evaluation.  If she's having problems in the job you
need to give her a counseling statement.  You need to have
a discussion with her about what the performance issues are
and you have to tell her what the consequences will be if she
doesn't improve her performance and coach her so she can
reach that level.

Dkt. #23, Exh. 9, p.5.

Plaintiff was not counseled, purportedly because Mr. Morgan was fired due to the department's lack of compliance with New York State regulatory requirements and standards set by the National Committee of Quality Assurance.  Dkt. #23, ¶ 16.  These standards require member complaints and appeals to be resolved within 30 days.  Dkt. #23, Exh. 10, p. 29-30.  Although Independent Health imposed the same 30-day standard for provider complaints and appeals, more than 1,000 provider complaints and appeals had been outstanding for more than 30 days at the time of Mr. Morgan's termination.  Dkt. #23, Exh. 10, p.29.

Following Mr. Morgan's departure, JoAnn Kopp-Russ became responsible for supervising plaintiff's department and developed new job descriptions and performance criteria for each employee within the department.  Dkt. #23, ¶ 17.  At her deposition, Ms. Kopp-Russ testified that a majority of the 18 employees in the department received counseling statements from her within her first six months in the department, either for work performance, attendance or excessive personal phone calls.  Dkt. #23, Exh. 10, p. 25.  Of the eighteen employees in the department, three were minorities.  Dkt. #23, Exh. 10, p. 25-26.

Seven employees left the department within the year, a turn over rate of 66%.  Dkt. #23, ¶ 18.   Two of the 7 employees were minorities – one transferred to another department and one was terminated for falsifying a document.  Dkt. #23, Exh. 10, p. 26.  Plaintiff was the only remaining minority employee within the department at the time of her termination.  Dkt. #23, Exh. 10, p. 26.  Since that time, all but one employee has left the department.  Dkt. #23, ¶ 18.

Ms. Wilcox became plaintiff's direct supervisor when Ms. Frisicaro left Independent Health in August, 2000.  Dkt. #23, ¶ 19.  Plaintiff was seeking transfer to other departments within Independent Health by this time because

> the demands of my department was too heavy.  The workload was too heavy, it was a lot of stress and pressure.

Dkt. #23, Exh. 14 & 25.

Plaintiff's job involved retrieving the mail, separating it into provider or member appeals and, if it was a member appeal, using POWER software to look up member information or if it was a provider appeal, looking up contract information. The paperwork would then be given to a clinical reviewer who would code or categorize the type of appeal before returning the paperwork to the data coordinators to log the appeal and enter the demographic and coding information into the computer database.  The paper work is then scanned into the computer and the hard copy is filed in a member or provider folder or bin.  With member appeals, an acknowledgment letter is mailed to the member before the file is given to an advocate for investigation and decision.  Once the advocate notifies the member of the decision, the data coordinator scans the letter notifying the member of the decision into the database and then updates the database with the decision date, notification date, decision rendered and any comments before closing the file and returning it to the advocate.  See Dkt. #27, Exh. M, pp. 13-20, 85-87, 152-155.

Plaintiff took a leave of absence to undergo surgery for carpal tunnel syndrome at the end of November, 2000.  Dkt. #23, ¶ 21.  Plaintiff returned to work on a

part time basis on January 29, 2001.  Dkt. #23, ¶ 22.  Plaintiff was released to return to

work full duty with no restrictions as of February 19, 2001.  Dkt. #23, Exh. 20.

Upon her return from disability, Ms. Wilcox began to keep a log of

plaintiff's errors.  Dkt. #30, ¶ 5.  Ms. Wilcox submitted an affidavit affirming that

> Many entries on the log were based on my daily review of
> Ms. Henigan's work.  I was reviewing Ms. Henigan's work
> because the computer database had been updated during
> Ms. Henigan's leave, and I wanted to make sure that she
> was entering information into the database correctly.  I had
> monitored Ms. Slazak's work in the same manner while Ms.
> Henigan was on disability leave.  I discontinued monitoring
> Mr. [sic] Slazak's work because she appeared to be entering
> information into the database correctly.

Dkt. #30, ¶ 5 & Exh. J.  Ms. Wilcox testified at her deposition that

> I was not finding mistakes on there, so I was comfortable
> with the fact Penny understood the process and entering the
> database.  If she hadn't, I would have continued to have
> been monitoring the process.

Dkt. #30, Exh. C, p. 173.

Ms. Wilcox was certain that the mistakes she logged as plaintiff's were

plaintiff's mistakes because

> Each day Ms. Henigan handed me the hard copy of the
> cases she logged into the database.  I would then compare
> the information contained in the hard copy of the case to the
> information contained in the database.

Dkt. #30, ¶¶ 6,8.  In addition, Ms. Wilcox affirms that she was sure that the mistakes

recorded in the log were plaintiff's because she was able to distinguish plaintiff's

handwriting and because she would ask plaintiff to correct her mistakes.  Dkt. #30,

¶ ¶ 9-10.  Ms. Wilcox also noted that although the calendar indicated primary

responsibility of the data coordinator for member or provider appeals, the data

coordinator would assist the other data coordinator or work on the backlog of provider

appeals if her assigned work was completed.  Dkt. #30, ¶ 8.  Ms. Wilcox's error log

records numerous data entry errors and repeated failure to scan documents.  Dkt. #23,

Exh. 22.

On March 23, 2001, Ms. Wilcox and her manager, Ms. Dulski, spoke with

Keith O'Brien in human resources regarding plaintiff's work performance.  Dkt. #23,

Exh. 22.  Thereafter, they provided plaintiff with a copy of the log Ms. Wilcox had been

keeping and informed her

> enough was enough.  If she made just one more mistake
> that we would have to write a counseling statement.

Dkt. #23, Exh. 22.   Plaintiff complained "that she was the only person being picked on."

Dkt. #23, Exh. 22.  Specifically, plaintiff "told her I didn't think it was fair because there

was [sic] two coordinators, we was [sic] doing the same thing, why was I the only one

that had to report back to her about my work."  Dkt. #23, Exh. 23.

Plaintiff met with Mr. O'Brien shortly thereafter, and complained that "other

people in the department are worse than she is."  Dkt. #23, Exh. 22.  Mr. O'Brien

documented the meeting as follows:

> Dorothy stated that she wanted out of her current
> department (Advocacy) and told me she wanted me to get
> her out of there.  I advised Dorothy that HR does not transfer
> people other than handle the process.  I explained the
> bidding process . . . . Dorothy then shared with me that she

was given a verbal warning and wanted to know how soon it would turn into a written warning.  I advised her that there was no way of giving her an exact answer, as it depended on the number of mistakes that she made and the seriousness of the mistakes.  She then stated "they might as well just fire me" at which time I explained the corrective discipline process, which was designed not to be "punitive" but rather to identify the area in need of repair and to fix it, and that we don't hire people to fire them.  She stated she had Diabetes and was concerned that this would throw her sugar out of balance and stated emphatically that she was not going to let this affect her health . . . . I did advise her that we are not looking for her to "speed up" her work and that maybe she was exerting pressure on herself, but that the real issue is her mistakes, and the fact that they are repeated errors.  I suggest that maybe she "proof" her work to make sure that all the information was correct before she processed it, as the real time consumer was doing the work over again . . . . Dorothy also stated she felt she was being singled out, at which time I stated that the mistakes spoke for themselves, and that I could not discuss other employees' performance with her.  In addition, she was the person who was making the most errors and that they were repetitive types of mistakes which should not be occurring.  Dorothy also stated that she was having problems with her carpal tunnel and that she might have to see her doctor regarding that, and I advised her that if it was affecting her that much it would be wise to see her physician.

Dkt. #23, Exh. 27.  In her affirmation, plaintiff states that she told Mr. O'Brien

that I believed I was being singled out because I was black.  I told him that I felt I was a target because I was the only black person left in the department.

Dkt. #27, ¶ 14.  At his deposition, Mr. O'Brien denied that plaintiff told him that she felt she was being discriminated against or that she felt she was being targeted because she was the last black employee in the department.  Dkt. #23, Exh. 28.

Ms. Wilcox denies treating Ms. Slazak differently than plaintiff.  Dkt. #30, ¶ 17.  In addition to the fact that she did keep a similar error log for Ms. Slazak, Ms.

Wilcox also notes that Ms. Slazak received a written counseling statement for her use of sick time and a verbal warning for making errors entering information into the database and scanning.  Dkt. #30, ¶ 16.  Ms. Wilcox affirms that "Ms. Slazak was not further counseled or terminated because she transferred to a different position in another department.  Dkt. #23, Exh. 11; Dkt. # 30, ¶ 16.

On March 30, 2001, Ms. Wilcox recorded that plaintiff had failed to record two member appeals.  Dkt. #23, Exh. 22.  Specifically, Ms. Wilcox wrote that

> Late in the day Melissa brought a couple of cases to my attention.  Melissa had received a fax from a lawyers office informing her that they had sent two cases to Independent Health and hadn't received acknowledgment of them. Melissa looked through the provider pile and found both cases which were consider continuation of care (expedited) cases.  According to Medicare and DOH standards we were out of compliance due to timeframe by hours.  It was obvious that these cases were member issues.  Dorothy didn't read the appeal just date stamped and handed off.

Dkt. #23, Exh. 22.  Plaintiff received a written counseling statement on April 11, 2001. Dkt. #23, Exh. 30.   Plaintiff declined to sign the counseling statement because she "felt everything on there was not true" and because of "the fact that [she] wasn't given enough training."  Dkt. #23, Exh. 31.  Plaintiff informed Ms. Wilcox that she would need to go part-time due to her hand and stress, and was told to check with Ms. Kopp-Russ regarding the availability of part-time work within the department.  Dkt. #23, Exh. 22.

Plaintiff called in sick on April 12, 2001.  Dkt. #23, Exh. 22.  On April 13, 2001, Ms. Kopp-Russ and Ms. Wilcox verbally counseled plaintiff regarding her use of 16 hours of sick time since her return to full-time employment at the end of February.

Dkt. #23, Exh. 22.   Plaintiff was instructed that she would be required to provide a

doctor's note indicating that she was unable to work and was ok to return whenever she

called in sick.  Dkt. #23, Exh. 22.


Plaintiff received her annual employee evaluation on April 17, 2001, which

included the following comments:

> Dorothy has made quite a few errors when looking up
> demographics for incoming appeals;
> Dorothy needs to concentrate on what is being scanned and
> what filename they are being given;
> Dorothy has had various errors on the appeal database.  I
> have given her back the errors and had her fix them.  In
> some cases, the errors have been made again;
> Dorothy will file daily;
> Dorothy is trained on WNY member correspondence and is
> able to process independently;
> I would like Dorothy to take a Power refresher course;
> As stated above, various errors are made in entry of the
> appeal database and scanning;
> Dorothy needs to have close supervision to ensure the work
> and timeframes are met;
> I would like to see Dorothy make some suggestions to
> streamline the process;
> I have noticed an improvement with Dorothy asking me more
> questions.  I feel that fewer mistakes will be made;
> Dorothy responds promptly to the work but the accuracy of
> that work is lacking;
> Works well with others;
> I would like to see Dorothy take responsibility/accountability
> for identifying skills she lacks to effectively perform her job;
> Dorothy demonstrates a lack of confidence and willingness
> to crosstrain.

Dkt. #23, Exh. 32.  Plaintiff responded to her evaluation with the following comments:

> I do not agree with the mistakes, just some.  Because when
> I returned from D.B. on 1/29/01 I had 2-3 mos providers
> complaints waiting to be processed in pain and under stress.
> Also members complaints I only had 2 weeks to learn the
> process, and members you have to do more research work,

> that wasn't enough time and the database scanning had
> also changed to a new process.  Therefore I will accept
> some of the blame.  But not all of it.  I will also try to improve
> and make less mistakes.

Dkt. #23, Exh. 32.  Her overall performance rating was "Needs Development."  Dkt.

#23, Exh. 32.

During her evaluation, plaintiff indicated that her hand was getting worse

and she was feeling extremely stressed.  Dkt. #23, Exh. 22.  Ms. Kopp-Russ informed

plaintiff that the department could not accommodate part-time employment because of

the backlog of provider appeals and encouraged plaintiff to speak with human

resources regarding the availability of part-time within other departments.  Dkt. #23,

Exh. 22.  After speaking with Mr. O'Brien, Ms. Kopp-Russ and Ms. Wilcox informed

plaintiff that they might be able to offer plaintiff part time work on a temporary basis

depending upon the restrictions set forth in plaintiff's doctor's note.  Dkt. #23, Exh. 22.

On April 18, 2001, Ms. Wilcox recorded the following incident:

> Kim Firzak approached me early on Wednesday to show me
> four appeals that were on her outstanding report that she
> doesn't have.  They are due to go out the end of this week.
> We looked all over to see if they were misplaced.  We found
> 2 of the appeals mixed in with the Provider appeals.  We
> haven't been able to find the other two.
>
> [Ms. Kopp-Russ] and I met with Dorothy and I explained the
> problem above.  We asked Dorothy if she knew where the
> other two appeals were.  She said she didn't know.  I
> explained that misplacing the correspondence was not a
> good thing but the most serious problem that we had was
> that the correspondence was not scanned into the system.  I
> explained that even though we misplaced the original we
> could have gone into IMAX and printed out the image to

> work on the appeal.  Another issue was that the
> acknowledgment letter was not scanned and we had no
> proof that one was done.  If the DOH had pulled any of the
> four cases, we would not have been in compliance.  I then
> explained that we would have to carry out the next step in
> the discipline noted on the counseling statement which
> would be suspension without pay.  I explained that Dorothy
> was not to return to work until she received a phone call
> from Human Resources.

Dkt. #23, Exh. 22.   Ms. Wilcox determined that plaintiff was to blame for this incident

because she had a calendar documenting whether plaintiff or Penny was responsible

for member appeals or provider appeals on a given week.  Dkt. #23, Exh. 34.  Plaintiff

asked to check IMAX to see if the appeals had been scanned and it was determined

that one of the appeals had been scanned, although the hard copy had not been

stamped "Scanned."  Dkt. #23, Exh. 22.  Plaintiff stated that she did not put the appeals

in the provider pile, prompting Ms. Wilcox to respond:

> that is not the major issue here.  The appeals have not been
> scanned.  We have no record of an acknowledgment letter.
> If it wasn't for the fact that these were verbal appeals we still
> wouldn't have a record.

Dkt. #23, Exh. 22.  The following day, it was noted that "there was a case noticed earlier

in the week that wasn't scanned."  Dkt. #23, Exh. 22.


Ms. Wilcox testified that she would not have been able to discover

plaintiff's failure to scan these documents because

> I had no paper copy.  That's what I was checking, I receive a
> hard copy of the appeal.  I compare that to the database.  If I
> didn't have a hard copy, I couldn't compare the hard copy to
> the computer version.

Dkt. #30, Exh. D, p. 148.  Ms. Wilcox affirmed that the appeals were received on March

19th and 20th, a week when plaintiff was assigned to work on member appeals.  Dkt. #30, ¶ 11.  In addition, Ms. Wilcox affirms and plaintiff concedes that plaintiff's handwriting appears on two of the misplaced appeals indicating that she was the individual who entered these appeals into the database.  Dkt. #30, ¶ 12; Dkt. #35, ¶ 15.

The decision to terminate plaintiff was made by Ms. Boyle, who testified at her deposition that the decision was based upon

> A variety of things: First of all, Dorothy had documented performance problems since April of 2000 when Mr. Morgan first talked to me.  So it was a longstanding problem, it wasn't just new.
> Secondly, I made sure our process had been followed; that Dorothy had received [a] verbal warning, that she had received a written warning, and the written warning contained documentation showing what the issues were.  And that she was well aware of what the consequences would be if she didn't improve her performance.  Then I looked at the last incident . . . that was the reason why she was finally terminated . . . . That she lost several appeals.

Dkt. #31, Exh. E, pp. 14-15.

Ms. Wilcox affirms that neither data coordinator position was filled after plaintiff's termination or Ms. Slazak's transfer.  Dkt. #30, ¶ 19.  Due to a decrease in volume and an increase in efficiency, the responsibilities of data coordinator have been assumed by a secretary.  Dkt. #30, ¶ 19.

Plaintiff filed a complaint with the New York State Division of Human Rights on May 3, 2001, alleging, that she is "black and have disabilities, diabetes and carpal tunnel."  Dkt. #27, Exh. 1.  Plaintiff further alleges that upon her return to work:

-14-

> There was a tremendous backlog of work and I was being
> pressured to do more work than I was able to do.  Also there
> was a new process in place that I was never trained to do.
> On February 19, 2001 I returned to full time work.  On March
> 23, 2001, Tracy [Wilcox], Team Leader and Michelle Dulski,
> Manager, called a meeting with me and Ms [Wilcox] told me
> that she was keeping a list of my mistakes.  I told her that I
> had not been trained in the new process and that the other
> employees were also making mistakes.  I asked if she was
> keeping a list on them as well.  She would not tell me.  I
> believe that I was being singled out in order to eliminate me
> because of my race.  I was the only black employee left in
> the department.  The other two had already been eliminated
> by a similar process.

Dkt. #27, Exh. I, ¶ 3.  Plaintiff also alleged that in early April of 2001, she "overheard

Ms. Dulski and Ms. [Wilcox] having on [sic] conversation saying that they were not

going to hire any minorities after I leave."  Dkt. #27, Exh. I, ¶ 5.  Plaintiff also

complained that although she was verbally counseled regarding her use of sick leave,

"other employees such as Penny Slazak, white,  have missed more sick days and were

not disciplined."  Dkt. #27, Exh. I, ¶ 7.


In her deposition, plaintiff testified that she overheard a conversation

between Ms. Wilcox and Ms. Dulski in which Ms. Wilcox referred to plaintiff by name

and stated that she "was making too many mistakes and that she didn't have the time

to keep checking my work."  Dkt. #31, Exh. A, p. 93.  Plaintiff also reported that either

Ms. Dulski or  Ms. Wilcox stated

> That due to the fact that once I would leave, they won't, they
> probably wasn't going to replace any of us.

Dkt. #31, Exh. A, p. 94.  In an affirmation, plaintiff states that Ms. Wilcox told Ms. Dulski

that she

> was making too many mistakes.  She also said that they will
> never hire any of "them" again.  At that time I was the last
> black employee in the department.  Under the
> circumstances, the comment about "them" appeared to me
> to have a racial overtone and I believe that was a
> reasonable interpretation . . . .

Dkt. #27, ¶ 9.


Ms. Wilcox denied making any statement regarding hiring of minorities or

hearing Ms. Dulski make any such statement.  Dkt. #30, Exh. H.  Ms. Dulski also denied

making any statment regarding hiring of minorities or hearing Ms. Wilcox make any

such statement.  Dkt. #31, Exh. B, p.45.  Ms. Wilcox also denied any request for

accommodation from plaintiff with respect to her diabetes.  Dkt. #30, Exh. H.


## DISCUSSION

### A.  Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while

resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799

(W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson* v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Maffucci*, 923 F.2d at 982, (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## B.    Plaintiff's Racial Discrimination Claim

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In the absence of direct evidence of discrimination, Title VII claims are analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, and its progeny.  411 U.S. 792, 802 (1973).

In order to establish a *prima facie* case of discriminatory discharge, the plaintiff must show (1) that she belongs to a protected class; (2) that she was qualified for the position; (3) that she was discharged; and (4) that her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.  *Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 91-92 (2d Cir.), *cert. denied*, 534 U.S. 951 (2001); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  Although plaintiff's burden in this regard is *de minimis*, the proffered evidence must still show circumstances that would be sufficient to permit a rational finder of fact to infer that each of these elements has been met.  *McLee v. Chrysler Corp.*, 109 F.3d 130, 134-135 (2d Cir. 1997) (citing cases).  With respect to the fourth element:

> The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, and, in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees, or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified.  A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the

-18-

> position, or, more generally, upon the timing or sequence of
> events leading to the plaintiff's termination.

*Chertakova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91-92 (2d Cir.1996) (internal

citations omitted).

In the instant case, there is no dispute that plaintiff has demonstrated the

first and third elements inasmuch as she is black and was discharged.  With respect to

the second element, the fact that plaintiff had been performing as a data coordinator for

more than five years is sufficient at this stage of the analysis to establish that she

"possesses the basic skills necessary for performance of the job."  *Slattery*, 248 F.3d at

92.  Similarly, plaintiff's allegation that two other minorities had been forced out of her

department, leaving her as the last minority in the department at the time of her

termination, coupled with her allegation that a white woman with the same job

responsibilities and supervisor received favorable treatment and that the supervisor

commented that they will never hire any of "them" again is sufficient to satisfy the fourth

element.  Accordingly, plaintiff has met her minimal burden of establishing a *prima facie*

case of racial discrimination.

Once the plaintiff has established a *prima facie case*, the employer is

required to offer a legitimate, nondiscriminatory business rationale for its actions.

*McDonnell Douglas*, 411 U.S. at 802; *see also Schnabel v. Abramson*, 232 F.3d 83, 87

(2d Cir. 2000).

> [T]he *McDonnell Douglas* presumption places upon the
> defendant the burden of producing an explanation to rebut

> the *prima facie* case – i.e., the burden of "producing
> evidence" that the adverse employment actions were taken
> "for a legitimate, nondiscriminatory reason." *Burdine,* 450
> U.S., at 254, 101 S.Ct., at 1094.  "[T]he defendant must
> clearly set forth, through the introduction of admissible
> evidence," reasons for its actions which*, if believed by the
> trier of fact*, would support a finding that unlawful
> discrimination was not the cause of the employment action.
> *Id., at 254-255, and n. 8, 101 S.Ct., at 1094-1095, and n. 8.*

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993) (emphasis in original).

Since the defendant's burden herein is one of production, not persuasion, credibility

assessment is not appropriate. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133,

142 (2000).


        The defendant has met this burden by bringing forth evidence that plaintiff

was terminated by decision of a neutral party due to performance issues documented

by several supervisors over a substantial period of time.  Dkt. #31, Exh. E, pp. 14-15.

Concerns about errors and inaccuracies were documented as early as 1999 by

supervisor Diane Frisicaro.  Dkt. #23, Exh. 4.  Plaintiff's response to such concerns

evince her frustrations with the demands of a changing work environment.  For

example, in April of 1999, plaintiff noted that the demands of her job were

> too high and when this happens then you are dealing with
> stress.  I have never in my life worked under such
> circumstances and a person should not be made to feel like
> this.

Dkt. #23, Exh. 6.  Plaintiff also complained that "things are always changing and now

we are up to 32 codes" and that the process "is a long process looking up this

information, logging and scanning and it seems that no one realizes this until they do it

themselves." Dkt. #23, Exh. 6.  In response to her 2000 evaluation, which showed improvement in accuracy, plaintiff again noted "times when the work load is more than one person could handle."  Dkt. #23, Exh. 7.

These comments reinforce Mr. Morgan's concerns that plaintiff was unable to manage the volume of work, as evidenced in his memorandum of April 17, 2000.  Dkt. #23, Exh. 8.  Mr. Morgan's proposal that plaintiff trade jobs with Penny Slazak suggests that Ms. Slazak was not demonstrating similar difficulties.  The need for increased productivity within the department and the seriousness of the consequences for failing to meet productivity standards is demonstrated by defendant's termination of Mr. Morgan for failure to comply with New York State regulatory requirements and standards set by the National Committee of Quality Assurance.  Dkt. #23, ¶ 16.

As a result of the backlog of appeals and the introduction of a new management team to the department, new performance criteria and job descriptions were developed for each of the 18 employees within the department.  Dkt. #23, ¶ 17. The new department supervisor issued counseling statements to the majority of the employees in the department during the first six months of her tenure.  Dkt. #23, Exh. 10, p.25.  Plaintiff's immediate supervisor, Tracy Wilcox, affirmed that she kept an error log for Penny Slazak and that Ms. Slazak received a written counseling statement for use of sick time and a verbal warning for data entry errors and scanning issues prior to her transfer to another department.  Dkt. #30, ¶ 16.  Seven employees left the department within the year, and all but one employee left the department thereafter.

Dkt. #23, ¶ 18.  Following plaintiff's termination and Ms. Slazak's transfer, neither data coordinator position was filled.  Dkt. #30, ¶ 19.

Plaintiff herself was actively seeking to transfer to another department, explaining that "the demands of my department was too heavy" and the "workload was too heavy, it was a lot of stress and pressure."  Dkt. #23, Exh. 25.  Moreover, while plaintiff denies responsibility for some of the mistakes attributed to her, she does not dispute that she made errors.  For example, in her evaluation in April of 2001, she responded to criticism regarding various and repetitive errors on the appeal database and lack of accuracy by noting that she had recently returned from disability leave and

> only had 2 weeks to learn the process, and members you
> have to do more research work, that wasn't enough time and
> the database scanning had also changed to a new process.
> Therefore I will accept some of the blame.  But not all of it.  I
> will also try to improve and make less mistakes.

Dkt. #23, Exh. 32.

With respect to the loss of the paperwork for four member appeals, it is clear that plaintiff entered at least two of these appeals into the database, but that at least one of them was not scanned.  Dkt. #30, ¶¶ 11-12; Dkt. #35, ¶ 15.  Pursuant to the process set forth in the motion papers before the Court, the paperwork should be returned from the clinical reviewer to be entered into the database and scanned by the data coordinator before being passed along to the advocate.  Dkt. #27, Exh. M. Collectively, this evidence is sufficient for defendant to meet its burden of demonstrating legitimate, nondiscriminatory reasons for plaintiff's termination.

Once the employer satisfies its burden of production, "the presumption of discrimination that was raised upon a showing of the *prima facie* case no longer operates." *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir. 1997).  Thus,

> once the employer has proffered a reason for its action, all presumptions and special rules drop away; a case under Title VII becomes like any other case in that the plaintiff, in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim.

*James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).  Because the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, the employer will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.  *Id., citing St. Mary's,* 509 U.S. at 510-11; *see also, Burdine*, 450 U.S. at 253.


Plaintiff has failed to proffer sufficient evidence to permit a reasonable trier of fact to find that her discharge from Independent Health was based upon racial animus.  For example, although she alleges that the other two minority employees in the department were "eliminated by a similar process," the evidence demonstrates that a data coordinator was terminated for fabricating a document in September of 2000 and that a provider advocate transferred to another department in April of 2002.  Dkt. #23, Exh. 11.  Similarly, while plaintiff complains that  "she was being singled out," the evidence demonstrates that Ms. Wilcox kept an error log for the other data coordinator, Penny Slazak, following the transition to the new database system and that Ms. Slazak received a written counseling statement regarding her use of sick time and a verbal

counseling regarding data entry and scanning errors.  Dkt. #39, ¶ 16.  More generally, the evidence demonstrates that a majority of the 18 employees in the department received written counseling statements during the first six months of Ms. Kopp-Russ' tenure and that thirteen employees were ultimately terminated from the department, beginning with Mr. Morgan.  Dkt. #23, Exh. 10, p.25 & Exh. 11.

Finally, although plaintiff's complaint alleges that she overheard Ms. Wilcox tell Ms. Dulski "that they were not going to hire any minorities after I leave," the evidence underlying that allegation reveals that she overheard Ms. Wilcox state "that once I would leave, they won't, they probably wasn't going to replace any of us."  Dkt. #27, Exh. I, ¶ 5 & Dkt. #31, Exh. A, p.94.   While plaintiff felt that this comment had a racial overtone, the evidence demonstrates that following the departure of plaintiff and Ms. Slazak, the data coordinator's responsibilities were transferred to a secretary.  Dkt. #30, ¶ 19.  In light of the absence of evidence from which a reasonable jury could infer unlawful discrimination, it is recommended that the defendant's motion be granted.

**C.    Plaintiff's Disability Discrimination Claim**

Although plaintiff's complaint alleges discrimination based upon both race and disability, plaintiff does not oppose defendant's motion for summary judgment with respect to disability.  Moreover, there is no medical evidence to suggest that plaintiff suffered from any disability.  The record before the Court contains nothing more in the way of medical documentation than two doctor's notes, the first one, dated January 31, 2001, limiting plaintiff to light duty 4 hours per day early morning shift and the second

permitting return to work full duty with no restrictions as of February 19, 2001.  Dkt. #23,

Exh. 20 & 21.  This evidence is insufficient to meet even the *de minimus* burden of a

prima facie case of disability discrimination under the ADA.  *See Dietrich v. E.I. DuPont

de Nemours & Co.*, 2004 WL 2202656, at *8 & 13 (W.D.N.Y. Sept. 28, 2004).


## CONCLUSION

Based on the foregoing, it is hereby recommended that defendant's

motion for summary judgment (Dkt. #13), be **GRANTED**.


Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the

Clerk of the Court.


ANY OBJECTIONS to this Report, Recommendation and Order must be

filed with the Clerk of this Court within ten (10) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute,

Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).


The district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but were not presented to

the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v.

Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>.   *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

DATED:      Buffalo, New York
            March 3, 2005

                              **S/ H. Kenneth Schroeder, Jr.**
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**